FILED
2018 Aug-14  PM 01:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | | |
|---|---|---|
| TERRY RUSHING ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COLBERT COUNTY, ALABAMA; | ) | CASE NO. |
| FRANK WILLIAMSON; CLETUS | ) | |
| "TOM" WATSON; MARCUS | ) | JURY TRIAL DEMANDED |
| RUTLAND; QCHC, INC.; DONALD | ) | |
| KERN; BRENDA LAWLER; and | ) | |
| UNKNOWN JAIL PERSONNEL, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff complains of defendants, stating as follows:

**INTRODUCTION**

1.     On or about October 24, 2016, Terry Rushing Alexander was brutally assaulted by three inmates at the Colbert County Jail.

2.     One of the inmates who assaulted plaintiff was Peter Capote, who was a capital murder defendant and has since been convicted and sentenced to death.

3.     The assault resulted from a complete breakdown of security at the jail, where inmate-on-inmate assaults had become routine.

4.     The dangerous conditions that led to the assault on plaintiff were well known to Colbert County officials, the sheriff (Williamson), and the jail administrator (Watson).

5.     The dangerous conditions resulted in part from jail facilities that County officials have known for many years were inadequate to safely house inmates.

6.     Defendants responded with indifference to the security crisis at the jail.

7.     Defendants' apathy culminated in plaintiff being assaulted.

8.     Plaintiff brings this action to redress his injuries and to end the abuse perpetrated on Colbert County inmates due to defendants' disregard for their safety.

9.     Plaintiff also brings this action to redress the denial of prompt medical care in the hours following the assault. Plaintiff suffered serious head trauma, which caused him to defecate on himself and affected his ability to see and stand, injuries that obviously required that plaintiff be taken to the emergency room. Nevertheless, defendants Williamson, Watson, Rutland, Kern, and Lawler refused for roughly 7 hours to get him the treatment he needed.

## JURISDICTION AND VENUE

10.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the defendants' deprivation of plaintiff's rights secured by the U.S. Constitution.

2

11. This Court has jurisdiction of plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state law claims pursuant to 28 U.S.C. § 1367.

12. Venue is proper under 28 U.S.C. § 1391(b), as the majority of the defendants reside in this judicial district and the events and omissions giving rise to plaintiff's claims occurred within this judicial district.

## PARTIES

13. Plaintiff Terry Rushing Alexander, a 41-year-old man, was in the jail on drug charges.

14. Defendant Colbert County, Alabama is an Alabama county. It is responsible for funding the Colbert County Jail.

15. Defendant Frank Williamson was the Colbert County Sheriff at all relevant times. As the sheriff, among other things, he is responsible for management of the Colbert County Jail. Defendant has a statutory duty under Alabama law to attend to the medical needs of inmates in the jail.

16. Defendant Cletus "Tom" Watson was the jail administrator at all relevant times.

17. Defendant Marcus Rutland was a jailer at all relevant times.

18.   Unknown jailers and jail staff members A, B, C, D, E, and F also worked at the jail on October 24, 2016, became aware of plaintiff's condition, but did not take steps to promptly get him the medical treatment he needed.

19.   Unknown jailers and jail staff members G, H, I, J, K, and L also worked at the jail on October 24, 2016, were aware that an assault on plaintiff was planned, yet took no action not protect plaintiff.

20.   Unknown jailers and jail staff members M, N, O, P, Q, and R also worked at the jail on October 24, 2016, became aware that a group of inmates were assaulting other inmates approximately 10 minutes before the assault on plaintiff, yet took no action not protect plaintiff and other inmates. Instead, these individuals allowed the inmates to continue assaulting inmates.

21.   Defendant QCHC, Inc. is a private, for-profit corporation that contracted with Colbert County to provide medical services at the Colbert County Jail.

22.   Defendant Donald Kern, M.D., is the medical director for QCHC and provided physician medical services at the jail for QCHC.

23.   Defendant Brenda Lawler was a licensed professional nurse working for QCHC at the jail at all relevant times. She was the medical team administrator and in charge of managing medical care at the jail on a day-to-day basis.

24.     Plaintiff sues each of the individual defendants in his or her individual capacity unless otherwise noted. Each of the individual defendants acted under color of law and within the scope of his or her employment when engaging in the misconduct described herein.

## FACTS

### The Assault on Plaintiff

1.     On October 24, 2016, at around 11:30 a.m., plaintiff was sitting in the common room watching TV when he was brutally assaulted by three inmates, including capital murder defendant Peter Capote.

2.     Plaintiff's head was kicked and knocked into metal rails.

3.     Plaintiff's head was bleeding, and he could feel the pressure building in his head shortly after the assault.

4.     Plaintiff also suffered broken ribs that affected his breathing.

5.     Approximately 10 minutes before plaintiff was assaulted, one or more of the same inmates had assaulted another inmate, David Hatfield.

6.     Despite being called, jailers, including Rutland, did not respond.

7.     If jailers had responded, plaintiff would not have been assaulted.

8.     These jailers, including Rutland, with deliberate indifference, just allowed the violent inmates to have their way.

9.     Other jailers, including Rutland, were aware that an assault on plaintiff was planned by Capote and his crew.

10.     Even after plaintiff was assaulted, jailers did not promptly respond.

11.     Eventually, after extensive banging on the pan hole by another inmate, jailers responded.

12.     Plaintiff informed jailers, including Rutland, regarding the beating. Jailers, including Rutland, learned plaintiff had lost consciousness, had defecated on himself, and was having balance issues. Plaintiff requested to go the hospital.

13.     Plaintiff was not sent to the hospital.

14.     Rutland told plaintiff to clean up, and plaintiff did.

15.     Roughly 45 minutes later Rutland asked plaintiff if he still needed to go to the hospital. Plaintiff said "yes" and that needed to go quickly because his "head wasn't right." He told Rutland that he could not stand without assistance, that he had blurry vision, and that he believed his ribs were broken because he was having trouble breathing.

16.     Rutland took plaintiff to see Lawler. Plaintiff told Lawler everything he had told Rutland, begged to go to the hospital, but was placed in a medical cell and told to "go to sleep." Plaintiff, who knew something was terribly wrong, was afraid to go to sleep and told Rutland and Lawler so.

17.     They responded, "Then don't go to sleep."

6

18.    Lawler called Kern and informed Kern regarding plaintiff's symptoms. Kern did not send plaintiff to the hospital.

19.    Because of the unrelenting pain in his head, plaintiff was desperate and beat and beat and beat on the door until a trustee came, who then told Rutland, Lawler, and others plaintiff needed to go the hospital.

20.    Rutland and Lawler informed Williamson and Watson of the situation.

21.    Rutland, Kern, Lawler, Williamson, and Watson did not send plaintiff to the hospital despite knowledge that he had suffered significant head trauma, that he was experiencing terrible suffering as a result, and that he urgently needed to go to the hospital.

22.    After shift change, around 6:30 p.m., over 7 hours after the assault, plaintiff was in the same or worse condition, and a new jailer, believed to be Jacob Wilbanks, contacted plaintiff. Plaintiff told Wilbanks about his condition, and the jailer said he would see what he could do.

23.    Roughly an hour later (8 hours after the assault), plaintiff was taken to Helen Keller Hospital. Doctors promptly recognized that he required a neurosurgeon, and plaintiff was transferred to ECM hospital, where he underwent a craniotomy (see below photo) to treat what medical records describe as a "dangerous left temporal epidural hematoma."



24.   Plaintiff has permanent brain damage. This damage was due in whole or in part to the deliberately-indifferent delay in getting plaintiff to the hospital.

25.   Plaintiff informed defendants who the perpetrators were.

26.   Capote, who has since been convicted and sentenced to death for capital murder, was the leader of a dangerous clique of inmates that jail personnel allowed to control that section of the jail without supervision.

27.    Neither Capote nor the other inmates who assaulted plaintiff (Andrew Singleton and James Craig Terry) were disciplined.

28.    Defendants Williamson and Watson routinely housed non-violent inmates like plaintiff with capital murder defendants and other violent inmates.

29.    Moreover, Lawler and Kern are final policymakers for QCHC regarding medical care at the jail, and both delayed sending plaintiff to the hospital.

30.    Further, it is the policy and custom of QCHC, in general and at this jail, to delay sending persons to the hospital.

31.    Thus, just over 2 months earlier, in August 2016, when Christopher Ogletree suffered a broken jaw, he was not promptly sent to the hospital.

32.    Plaintiff suffered traumatic and serious physical and emotional injuries because of the assault and the delay in medical treatment.

33.    Plaintiff is burdened with thousands of dollars in medical bills.

### The Colbert County Jail Is Unsafe for Inmates

34.    The Colbert County Jail, though built in 1962 to handle 62 inmates, for decades has been routinely handling 100-125 inmates.

35.    Colbert County officials have recognized the need for a new jail facility for decades.

36.    By the 1970s, it was recognized that the jail was not built large enough in the first place and was clearly inadequate to safely house 100-125 inmates.

9

37. Because of the limitations of the facilities, jail personnel are limited in their ability to protect non-violent inmates from dangerous inmates.

38. These limitations were known to Colbert County officials for decades. Nevertheless, with deliberate indifference, Colbert County did not address the problem.

39. Defendants Williamson and Watson, acting with deliberate indifference, routinely housed dangerous inmates, including capital murder defendants, in crowded conditions with non-violent inmates like plaintiff.

40. Defendants Williamson and Watson, acting with deliberate indifference, established an unreasonable and longstanding policy of not identifying and segregating inmates known or likely to be perpetrators of assaults.

41. Plaintiff was assaulted by an inmate who had already displayed violent behavior with other inmates, who was in jail for a violent offense, and who was part of a violent clique that dominated the section of the jail in which plaintiff was housed.

42. Long before the assault, Colbert County officials, Williamson, Watson, and others, were aware that assaults were a serious problem.

43. Nevertheless, defendants Williamson and Watson failed to promulgate, implement, and enforce adequate policies, procedures, and practices necessary to

adequately supervise and monitor the housing units to maintain the safety of inmates therein.

44. The jail was both dangerously overcrowded and dangerously understaffed at the time plaintiff was attacked, putting inmates such as plaintiff at substantial risk of harm.

45. Defendants also fueled a culture of violence by failing to discipline or prosecute inmates for violent acts.

46. Defendants failed to adequately and effectively separate violent inmates even though they knew that the failure to do so had contributed to violence in the past.

47. These failures emboldened assault perpetrators, leading them to understand that they could assault other inmates with impunity and creating a substantial risk of harm to inmates such as plaintiff.

## CLAIMS

### Count I - 42 U.S.C § 1983
### Failure to Protect
### Against Colbert County, Williamson, Watson, and Rutland

48. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

11

49.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in jail.

50.    Defendants, acting individually and in conspiracy with other defendants, failed to protect plaintiff.

51.    Defendants knew of and consciously disregarded the substantial risk that plaintiff would be injured while incarcerated, failing to protect him from harm.

52.    The misconduct described in this count was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of plaintiff and others and was objectively unreasonable.

53.    Defendants' misconduct directly and proximately caused plaintiff to be subjected to an unreasonable risk of serious harm, and caused him to suffer damages including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal assault and its devastating aftermath.

### Count II - 42 U.S.C § 1983
### Denial of Care for a Serious Medical Need
### Against Williamson, Watson, Rutland, Lawler, Kern, and QCHC

54.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

55.    After being assaulted, plaintiff had an objectively serious need for health care.

56. Defendants had notice of plaintiff's health care needs and the seriousness of his health care needs, and yet, they failed to provide him with necessary health care, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

57. The misconduct described in this count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and/or deliberate indifference to the rights of plaintiff.

58. The denial of medical care was pursuant to a policy or custom of QCHC.

59. Because of defendants' unjustified and unconstitutional conduct, plaintiff suffered damages, including physical and emotional harm.

### Count III - 42 U.S.C § 1983
### Medical Negligence – Against Lawler, Kern, and QCHC

60. Plaintiff incorporates each paragraph of this complaint as if fully restated herein.

61. Defendants Lawler and Kern failed to meet the standard of care for similarly-situated healthcare providers regarding plaintiff's care and condition, including failing to properly assess and treat plaintiff's condition and failing to promptly send plaintiff to the hospital.

62. Each of these failures resulted in plaintiff experiencing unnecessary suffering and caused plaintiff to have permanent brain damage.

13

63.    QCHC nurses, aids, charge nurses, physicians, and other care providers, including the named defendant, acted as employees or agents of QCHC, and within the line and scope of their employment or agency and/or for the benefit of QCHC. Therefore, QCHC is liable under agency principles.

64.    A reasonably prudent healthcare provider to inmates at a correctional facility such as QCHC, operating under the same or similar conditions, would not have failed to provide the care listed above. Each of the foregoing acts and patterns of negligence on the part of these defendants, operating separately or in combination with other defendants jointly and cumulatively, proximately contributed to cause plaintiff's suffering.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

s/ Henry F. (Hank) Sherrod III
Henry F. (Hank) Sherrod III
No. ASB-1200-D63H
HENRY F. SHERROD III, P.C.
119 South Court Street
Florence, Alabama 35630
Phone: 256-764-4141
Fax: 877-684-0802
Email: hank@alcivilrights.com

Attorney for Plaintiff

14